UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**MARY LOU DONOVAN,**                                    Chapter 7
    Debtor                                         Case No. 13-13767-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**JOHN O. DESMOND, CHAPTER 7 TRUSTEE,**
    Plaintiff
v.                                                       Adv. P. No.15-1106
**MICHAEL J. DONOVAN,**
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MEMORANDUM**

**I. INTRODUCTION**

The matter before the Court is the three-count Complaint filed by the Plaintiff, the Chapter 7 Trustee of the bankruptcy estate of Mary Lou Donovan (the "Debtor") against the Defendant, Michael J. Donovan (the "Defendant"), who is the Debtor's son. Pursuant to his Complaint, the Trustee seeks to avoid and recover fraudulent transfers made by the Debtor to the Defendant under 11 U.S.C. §§ 544, 548 and 550. Specifically, the Trustee seeks the avoidance of the transfers under Mass. Gen. Laws ch. 109A, §§ 5(a)(2) and 6(a) and 11 U.S.C. § 548(a)(1)(B). At the trial, however, the Plaintiff waived Count III pursuant to which he sought to avoid the transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

In their Joint Pretrial Memorandum, the parties agreed that the adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F) and (H), and the

1

Defendant expressly consented to the entry of a final order by this Court. At the trial, three witnesses testified and nine exhibits were introduced into evidence. The issues include whether the Debtor was insolvent at the time she made two transfers to her son totaling $15,000, and whether the Defendant provided reasonably equivalent value for the transfers. The Court now makes the following findings of fact and rulings of law pursuant to Fed. R. Bankr. P. 7052.

**II. FACTS[1]**

The Debtor filed a voluntary Chapter 7 petition on June 20, 2013. She testified that at the time she filed her petition, she had been retired from her position as Budget Director for the City of Boston. As a City employee for thirty-two years, she received retirement benefits in the form of an annual $80,000 pension. Consistent with her testimony, the Debtor reported monthly income of $6,588 on Schedule I-Current Income of Individual Debtor(s). She reported monthly expenses of $6,978.98, including a monthly mortgage payment of $1,566, monthly medical and dental expenses of $745, as well as significant expenses for taxes and installment payments related to her automobile. Her expenses exceeded her income.

On Schedule A-Real Property, the Debtor listed an ownership interest in a condominium located at 45 Village Drive, Quincy, Massachusetts. She valued the property at $350,000 and disclosed that it was subject to a mortgage in the approximate

---

[1] The Court may take judicial notice of its own docket. *See* LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir. 1999) ("The bankruptcy court appropriately took judicial notice of its own docket.").

amount of $277,000. On Schedule B-Personal Property, the Debtor listed, among other assets, a Massachusetts Deferred Compensation SMART Plan (the "SMART Plan") with a value of $15,638.17[2] and a 2013 Nissan Altima to which she ascribed no value, although on Schedule D-Creditors Holding Secured Claims, she disclosed that the automobile was subject to a lien in the sum of $11,129. At trial, she testified that the automobile was leased, although the lease was not reported on Schedule G-Executory Contracts and Unexpired Leases. On Schedule C-Property Claimed as Exempt, the Debtor elected the Massachusetts exemptions and claimed her assets as exempt, including her real property located at 45 Village Drive, Quincy, Massachusetts pursuant to Mass. Gen. Laws ch. 188, §1 and her SMART Plan pursuant to Mass. Gen. Laws ch. 235, § 34A.

On Schedule F-Creditors Holding Unsecured Nonpriority Claims, the Debtor listed nine creditors with claims totaling $45,588.80, including an unsecured loan obligation in the sum of $17,537 owed to the City of Boston Credit Union (the "Credit Union"). The Debtor testified that she utilized the Credit Union for many of her banking needs and was a long standing customer.

In 2009, the Debtor maintained several accounts at the Credit Union, including a "negotiable order of withdrawal" or NOW account (***7540), a Primary Share account (***7501), and a Christmas Club account (***7508). In addition, she had an outstanding personal loan (***9331) with a balance of $14,931.25 as of June 30, 2009. The Debtor's

---

[2] According to a statement introduced at trial as Plaintiff's Exhibit 6, the SMART Plan had a value of $129,047.56 on June 30, 2009 and $146,030.67 on September 30, 2009.

3

Credit Union Statement for June 30, 2009 revealed that she had $221.81 in her NOW account, $15,033.80 in her Primary Share account, and, as noted, $14,931.25 outstanding on her personal loan. The Debtor's July 31, 2009 Statement revealed that she had $254.51 in her NOW account and $4,057.04 in her Primary Share account. In addition, as of July 31, 2009, the Debtor's outstanding balance on her existing personal loan (***9331) was $14,830.05, $101.20 less than the previous month.

On July 10, 2009, the Debtor transferred $10,000 from her Primary Share account into her NOW account. On that same day, she transferred $10,000 to the Defendant for no consideration.[3]

On July 29, 2009, the Debtor executed a "Credit Line Account and Personal Loan Application" in which she requested a loan in the sum of $20,000 for a "down payment for son's house." On the Application, she disclosed that she was a "Management Analyst" in the Public Works Department of the City of Boson with a monthly gross income of $8,140.14 and that the loan would be repaid through payroll deductions. Although she did not list assets on the Application, she did list six open accounts, one relating to a mortgage owed to Wachovia Mortgage, FSB in the sum of $323,976, and one relating to an automobile lease with an outstanding balance of $1,714. The remaining four accounts, included an American Express (AMEX) account with a $125 balance, an account with Bloomingdales (BLMDSNB) with a $517 balance, an account with "Citi" with a balance of $3,366, and an account with Lord & Taylor (GEMB/L&T) with a $308 balance. The

---

[3] As discussed below, the Defendant makes the argument that a version of "love and affection" constituted reasonably equivalent value for the transfers.

Credit Union approved her Application for the sum she requested, and the Debtor executed a Loan Agreement on August 5, 2009 pursuant to which she agreed to repay the Credit Union $20,000 at an interest rate of 8.990%.

As of August 31, 2009, the outstanding balance on her existing personal loan (***2331) was $-0-. The outstanding balance on her new loan (***4243) was $19,803.45, and the funds in her NOW account equaled $53.37. The August 31, 2009 NOW account Statement reflects the deposit of $20,000 in loan proceeds on August 5, 2009, a withdrawal of $14,881.19 to satisfy the Debtor's existing personal loan (***2331), and the clearance of a check in the sum of $5,000 on August 11, 2009. The Debtor testified that she gave the Defendant a check, dated August 7, 2009, in the sum of $5,000. In total, the Debtor gave the Defendant $15,000, and she conceded at trial that she received nothing in return.

After issuing the $5,000 check, the Debtor had $207.23 remaining in her NOW account, $3,183.24 in her Primary Share account, $601.32 in her Christmas Club account, and $3,640.15 in her Money Market account, for a total of $7,631.94.

At the time of the transfers to her son, the Debtor was living in a condominium located at 29 Village Drive, Quincy, Massachusetts. The Debtor recorded a declaration of homestead with respect to that property. The Debtor sold that property approximately three months after the transfers to her son, on November 30, 2009, for $378,000 to Judith M. Gonsalves in an arm's length transaction.

The Debtor testified that the values she listed for household goods, electronics, clothing, and jewelry on Schedule B of her bankruptcy petition did not reflect any substantial acquisitions after July 2009, although she indicated that the value of her

5

housewares in 2009 may have been worth "a little more" than in June of 2013. In addition, the Debtor testified that she was a participant in a SMART Plan, which had a value on June 30, 2009 of $129,047.56 and on September 30, 2009 of $146,030.67.

With respect to her liabilities, the Debtor testified that the debts listed on her Loan Application in July 2009 existed in August of 2009, such that in July her liabilities were $20,910.74, including $14,880.74 owed to the Credit Union; on August 11, 2009 her liabilities were $25,471.93, including $19,869.93 owed to the Credit Union and a lesser sum owed on her car lease (i.e., $1,286 in August versus $1,714 in July).

On cross-examination, the Debtor testified that she used monies in her SMART Plan to pay off debt. In addition, she used some of the monies for a down payment on a different condominium on Village Drive in Quincy, Massachusetts. She also indicated that when she was employed by the City of Boston she earned approximately $110,000 but upon retirement in 2010 her annual income was reduced to $80,000.[4]

The Chapter 7 Trustee testified as to the Debtor's claimed exemptions, indicating that he did not object to them. He also testified that the assets the Debtor owned in mid-2009 would be exempt as well, including her condominium at 29 Village Drive, Quincy, for which she recorded a Massachusetts homestead and the monies in her SMART Plan. With respect to the latter, he stated:

> [T]hey would have been exempt under the Massachusetts Pension Protection Act, which is like Mass 11 General Law Chapter 235, Section . . . 34A . . . . They probably wouldn't have been property of the estate under the Supreme Court cases where it's ERISA qualified.

---

[4] On her Loan Application, she listed her monthly income at $8,140.14 which would yield an annual income of approximately $98,000.

The Trustee testified that the Debtor would have been able to exempt at least some of the monies deposited in the Credit Union pursuant to Mass. Gen. Laws ch. 235, § 34 in 2009.

The Trustee submitted two exhibits setting forth the Debtor's assets and unsecured liabilities at the time of the July 10, 2009 transfer of $10,000 and at the time of the August 11, 2009 transfer of $5,000. Although the Debtor's testimony about the values of her personal assets in mid-July was unclear, she did not establish that any of the assets had significantly more value that the values she ascribed them on Schedule B filed four years later in June of 2013. Moreover, even if the 2009 values were somewhat greater, it would not affect the solvency analysis employed by the Plaintiff.

The exhibits prepared by the Plaintiff, as amended by the Court, reveal the following:

**Debtor's Assets and Liabilities as of July 10, 2009**

| Asset | Value | Lien | Exemption | UFTA Value |
|---|---|---|---|---|
| Real estate | $378,000 | $323,000 | G.L. ch. 188, 1 $500,000 | $-0- |
| Credit Union Deposits | $10,308.22 | | G.L. c. 235, § 34(15) $125 | $10,183.22 |
| Housewares | $700 | | G.L. c. 235, § 34(2) $3,000 | $-0- |
| TV, Computer, etc. | $800 | | G.L. c. 235, §34(2) $3,000 | $-0- |
| Clothing | $500 | | G.L. c. 235. § 34(1) 100% | $-0- |
| Jewelry | $1,800 | | | $1,800 |
| SMART Plan | $146,030.67 | | G.L. c. 235, § 34A 100% | $-0- |
| Car lease | $-0- | | | $-0- |
| TOTAL ASSETS | | | | $11,982.22 |
| TOTAL LIABILITIES | | | | $20,910.74 |

7

**Debtor's Assets and Liabilities as of August 11, 2009**

| Asset | Value | Lien | Exemption | UFTA Value |
|---|---|---|---|---|
| Real estate | $378,000 | $323,000 | G.L. ch. 188, 1 $500,000 | $-0- |
| Credit Union Deposits | $7,631.94 | | G.L. c. 235, § 34(15) $125 | $7,506.94 |
| Housewares | $700 | | G.L. c. 235, § 34(2) $3,000 | $-0- |
| TV, Computer, etc. | $800 | | G.L. c. 235, §34(2) $3,000 | $-0- |
| Clothing | $500 | | G.L. c. 235. § 34(1) 100% | $-0- |
| Jewelry | $1,800 | | | $1,800 |
| SMART Plan | $146,030.67 | | G.L. c. 235, § 34A 100% | $-0- |
| Car lease | $-0- | | | $-0- |
| TOTAL ASSETS | | | | $9,306.94 |
| TOTAL LIABILITIES | | | | $25,471.93 |

The Court utilized the applicable exemption amounts set forth in Mass. Gen. Laws ch. 235, §§ 34, 34A which were in effect in 2009. The exemption statute was amended by St. 2010, ch. 431, § 4, effective April 7, 2011. The amendment increased the dollar amount of exemptions and also set forth additional assets that can be claimed as exempt that previously could not have been exempted, such as jewelry. The current statute also includes a catch all provision for personal property. *See* Mass. Gen. Laws ch. 235, § 34(17) and (18).

Based upon the exhibits reproduced above, the Debtor's liabilities exceeded her assets after the transfers to the Defendant.

### III. DISCUSSION

The Trustee relies on 11 U.S.C. § 544(b)(1), which provides that a trustee may avoid a transfer of property that is avoidable under nonbankruptcy law, provided that there is

8

an actual unsecured creditor who could avoid such a transfer. The Plaintiff established that a creditor, the Credit Union, existed at the time of the transfers of an interest in the Debtor's property to the Defendant and that the debt remains unpaid. Accordingly, the Plaintiff maintains that he may use the avoiding power under § 544(b)(1) to avoid the transfers that occurred on July 10, 2009 and August 11, 2009 - - less than four years before the commencement of the Debtor's bankruptcy case on June 20, 2013. *See* Mass. Gen. Laws ch. 109A, § 10.[5]

With respect to Count II, the Court concludes that the Trustee unequivocally established the four requisite elements for relief under Mass. Gen. Laws ch. 109A, § 6(a), namely "(1) that a transfer occurred; (2) at a time when a creditor was in existence; (3) that the Debtor did not receive reasonably equivalent value for the transfer; and (4) that

---

[5] Section 10 provides:

> A cause of action with respect to a fraudulent transfer or obligation under this chapter shall be extinguished unless action is brought:
>
> (a) under paragraph (1) of subsection (a) of section five, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant;
>
> (b) under paragraph (2) of subsection (a) of section five or subsection (a) of section six, within four years after the transfer was made or the obligation was incurred; or
>
> (c) under subsection (b) of section six, within one year after the transfer was made or the obligation was incurred.

Mass. Gen. Laws ch. 109A, § 10

the Debtor was insolvent at the time of the transfer or rendered insolvent by the transfer."[6] See Desmond v. Chiang (In re Chiang), No. 14-14344-JNF, 2016 WL 7396708, at *10 (Bankr. D. Mass. Dec. 21, 2016). Neither the Debtor nor the Defendant challenged the existence of the transfers, and the Court concludes that the transfers in the form of gifts made by the Debtor to her son were for less than reasonably equivalent value. The Court rejects the Defendant's assertion that he shared "an identity of interests" with the Debtor such that the down payment on his home that he shares with his wife and four children was reasonably equivalent value because the Debtor was benefitted by "being able to see her grandchildren and son and stay with them whenever she would like." While the Court does not discount the Debtor's generosity and her wish to see her son and his family settled in a new residence, the Court does not consider such good will or love and affection reasonably equivalent value.

In DeGiacomo v. Sacred Heart Univ., Inc. (In re Palladino), 556 B.R. 10 (Bankr. D. Mass. 2016), the court set forth the applicable law, stating:

> Ethereal or emotional rewards, such as love and affection, do not qualify as value for purposes of defeating a constructive fraudulent conveyance claim. Pereira v. Wells Fargo Bank, N.A. (In re Gonzalez), 342 B.R. 165, 169 (Bankr.

---

[6] Section 6(a) provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Mass. Gen. Laws Ann. ch. 109A, § 6(a).

10

>   S.D.N.Y. 2006); *see also* Tavenner v. Smoot, 257 F.3d 401, 408–09 (4th Cir. 2001). [The Trustee] . . . correctly points out that under Massachusetts law a parent has no legal obligation to support an adult child and so, he suggests, the only possible justification the [Debtor] could have had for paying . . . college costs were of a recondite variety. Thus, the Debtor did not receive reasonable equivalent value for the transfers in the form of an ability to visit her son or stay with him.

In re Palladino, 556 B.R. at 15.

Finally, the Plaintiff relies upon the exhibits reproduced above to establish that the Debtor was insolvent.[7] Pursuant to Mass. Gen. Laws ch. 109A, § 3(a), a debtor is insolvent "if the sum of the debtor's debts is greater than all of the debtor's assets, at fair valuation." Thus, only nonexempt property is considered an asset for the purposes of determining insolvency. *See* Wolkowitz v. Beverly (In re Beverly), 374 B.R. 221, 238 (B.A.P. 9th Cir. 2007), *aff'd in part, appeal dismissed in part*, 551 F.3d 1092 (9th Cir. 2008). *See also* In re Chiang, 2016 WL 7396708, at *10. The Plaintiff maintains that the Debtor was insolvent or rendered insolvent as a result of the transfers. In other words, the Debtor's liabilities exceeded the value of her nonexempt assets at the time of the transfers. The exhibits reproduced above unequivocally establish that the Debtor was insolvent on July 10, 2009

---

[7] The Debtor's most significant asset in mid-July 2009, other than her residence, was her SMART Plan. The Debtor testified that she used funds in that plan to pay down debt. Nevertheless, when she commenced her bankruptcy case in June of 2013, she had funds totaling $15,638.17 in the SMART Plan which funds she claimed as exempt pursuant to Mass. Gen. Laws ch. 235, § 34A. Although this Court could not independently verify whether the Debtor's SMART plan was ERISA-qualified, the Trustee did not challenge the Debtor's claimed exemptions and the Debtor did not argue that funds totaling approximately $146,000 in the SMART PLAN were nonexempt for purposes of a solvency analysis. In view of her reliance upon § 34A on Schedule C, she would be estopped to challenge the exempt status of the SMART Plan funds in 2009.

and August 11, 2009. Accordingly, the Trustee satisfied all four elements set forth in Mass. Gen. Laws ch. 109A, § 6(a) and satisfied his burden of proof under Count II.[8]

## IV. CONCLUSION

In accordance with the foregoing, the Court shall enter judgment in favor of the Plaintiff and against the Defendant on Count II. Count I is moot and Count III was waived by the Plaintiff.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated: January 25, 2017

---

[8] Because the Plaintiff proved entitlement to relief under Mass. Gen. Laws ch. 109A, § 6(a), the Court need not consider the relief requested under § 5(a)(2). That section provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: . . .
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: . . .
>
> (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Mass. Gen. Laws Ann. ch. 109A, § 5(a)(2). At the time of the transfers the Debtor was employed earning an annual salary of approximately $100,000, and had no difficulty satisfying her obligations. She filed her bankruptcy petition because her reduced retirement income prevented her from fulfilling her financial obligations. Were the Court to rule on Count I, the Court would conclude that the Plaintiff failed to sustain his burden with respect to § 5(a)(2).